VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.
Julian R. Birnbaum (JB6721)
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300
Attorneys for Plaintiff John Chen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

JOHN CHEN,

       Plaintiff,    05 CV 4643

 - against -        COMPLAINT

CITIGROUP GLOBAL MARKETS INC.,    PLAINTIFF DEMANDS
                TRIAL BY JURY
       Defendant.

------------------------------------------------------------x

    Plaintiff John Chen ("plaintiff" or "Chen"), by his attorneys Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Citigroup Global Markets Inc. ("defendant" or "Citigroup") as follows:

## NATURE OF THE CASE

    1. Plaintiff brings this action pursuant to the Civil Rights Act of 1964, as amended 42 U.S.C. §§2000e et seq. ("Title VII"); 42 U.S.C. §1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Executive Law §§290 et seq. ("HRL"); and the New York City Human Rights Law, N.Y. City Administrative Code §§8-101 et seq. ("City HRL") to remedy discrimination in the terms and conditions of his employment based on race, ancestry and national origin, and retaliation against him for complaining of discrimination. As set forth

228315 v1

below, after Chen experienced racist and sexist comments made by a senior banker and was subjected to discriminatory treatment, Chen complained of discrimination internally and subsequently informed defendant of his intention to file, and did file, a charge of discrimination with the Equal Employment Opportunity Commission. Citigroup thereafter retaliated against Chen, including placing him on review by a Performance Improvement Plan, paying him the lowest bonus of his Associate class, and terminating his employment on pretextual grounds.

2. Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, Section 1981, the HRL and the City HRL.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over plaintiff's Title VII and Section 1981 claims under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§1331 and 1343. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over plaintiff's HRL and City HRL claims, which are so related to the Title VII and Section 1981 claims that they form part of the same case or controversy, arising from a common nucleus of operative facts.

4. Venue is proper in this District pursuant to Title VII, 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §1391(b), (c), because the unlawful practices complained of herein were committed, and defendant maintains offices, within this District.

5. Plaintiff has complied fully with all administrative prerequisites to filing this action. Plaintiff filed a timely charge and amended charges with the United States Equal Employment Opportunity Commission ("EEOC") on or about November 6, 2003, December 31, 2003 and February 13, 2004, complaining of the unlawful employment practices alleged herein.

After investigation, the EEOC issued a Letter of Determination on December 16, 2004, which found probable cause to believe that plaintiff was subjected to retaliation after he filed internal complaints of discrimination and a hostile work environment. The EEOC issued a Notice of Right to Sue on February 16, 2005, and this action has been filed within 90 days thereafter.

6. Pursuant to §8-502(c) of the City HRL, prior to filing this Complaint, plaintiff served copies of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

7. Plaintiff John Chen is an Asian citizen of the United States of Chinese ancestry and national origin. He was employed by defendant from August 2002 as an Associate until the involuntary termination of his employment on February 6, 2004.

8. Defendant Citigroup Global Markets Inc. ("Citigroup") is an international securities firm that provides financial services to corporations, financial institutions, and other institutional and individual investors.

9. Defendant is an employer as defined by Title VII, the HRL, and the City HRL.

## FACTUAL ALLEGATIONS

10. Chen received a J.D. degree from Harvard Law School in spring 2002. He received a Master's degree in Professional Accounting and a Bachelor's degree in Business Administration from The University of Texas at Austin in spring 1999.

11. After his second year of law school, Chen was employed as a Summer Associate at Citigroup in the Investment Banking Division ("IBD") from June 2001 to August

228315 v1                                           3

2001, during which he was a superior performer, receiving positive reviews and an offer to join Citigroup full-time. Chen began work for Citigroup full-time as an Associate in August 2002.

12. The IBD provides financial advice to investment banking clients on transactions including mergers and acquisitions, divestitures, leveraged buyouts, financial restructurings and a variety of cross-border transactions. The IBD is also engaged in a range of capital market activities, including the underwriting and distribution of debt and equity securities and providing alternative financing options.

13. The IBD has several groups that specialize in covering companies from specific industries, including the Consumer Group, which provides investment banking services to consumer and consumer-related companies.

14. After approximately two months of initial training, Chen spent approximately six months rotating through three different groups within the IBD: the Financial Entrepreneurs Group, the Real Estate Group, and the Financial Institutions Group. Throughout his rotations, Chen consistently received positive feedback regarding his work performance, noting that he was "eager to learn and contribute…very willing to help with whatever was needed and was reliable to be there when needed," and that he had an "excellent attitude and work ethic," "quantitative skills [that] are very strong" and "writing skills [that] are impeccable."

15. Chen also actively participated in recruiting and interviewing on behalf of Citigroup, including recruiting events with Harvard, New York University School of Law and The University of Texas at Austin.

16. Chen was treated differently from non-Asian Associates in his class of Associates with respect to permanently placing Associates into groups within the IBD.

17. In March 2003, towards the end of rotations, Associates in Chen's class were asked to rank their choices of groups within the IBD in which they wished to be placed permanently. On information and belief, the Consumer Group was the least popular choice among Associates in Chen's class, as initially all Associates resisted being permanently placed in the Consumer Group, and the Consumer Group was eventually able to convince only one Associate, other than Chen, to join it permanently.

18. On information and belief, after the completion of rotations, four Associates, including Chen, did not "match" with one of the groups in the IBD through which they had rotated: a white female, a white male, an African American male, and Chen.

19. On information and belief, Kathleen Balistreri, who was the primary facilitator between Associates and the IBD groups, arranged for the remaining four unassigned Associates to meet with groups that still had open positions available. On information and belief, Balistreri allowed the white female Associate to meet first with the Consumer Group; and when she resisted being placed there, Balistreri permitted her to meet with another group, which she subsequently joined.

20. On information and belief, when the white male resisted being placed with the Consumer Group, Balistreri did not force him to meet with the Consumer Group, but instead permitted him to meet with another group, which he subsequently joined.

21. On information and belief, when the African American male met with the Consumer Group and resisted being permanently placed there, he was subsequently fired.

22. In contrast, Balistreri did not permit Chen to meet with other groups within the IBD. When Chen requested other meetings like that given to the white Associates, Balistreri said that all other groups had been filled, and that that his only choices were either to

join the Consumer Group or be fired. Balistreri did promise Chen that she would check-in on him over the following months and that she would have him moved to another group if he were unhappy in the Consumer Group after six months.

23.   In March 2003, Chen was permanently placed in the Consumer Group, where he worked until his employment was terminated on February 6, 2004.

24.   The positions of investment bankers within the IBD (including the Consumer Group) in descending order of authority are Managing Director, Director, Vice President, Associate and Analyst. Managing Directors and Directors are considered senior bankers; Associates and Analysts are considered junior bankers.

25.   There is also an Associate Staffer in each group, who is responsible for assigning work to Associates, and plays an integral role between the assigned Associates and senior bankers of the group. The Associate Staffer also has functions between the Associates and other groups, including but not limited to the IBD's Associate Compensation Committee (which approves year-end bonuses for Associates) and various Citigroup human resources and administrative personnel.

26.   Shortly after joining the Consumer Group, Marco Habert, who was a Director and the Associate Staffer for the Consumer Group, began and continued to make racist and sexist comments in Chen's presence on multiple occasions.

27.   Habert made inappropriate, sexist remarks to Chen regarding the "pussies" of women at a Consumer Group dinner in April 2003. A few weeks later, in May 2003, Habert made racist comments to Chen about Arabs. In referring to an article Chen was reading about an Israeli helicopter that had mistakenly shot and killed a car full of Arab women and children, Habert said "Good. We should kill more of them [referring to Arabs]." Two other junior

bankers confirmed that Habert had made other inappropriate racist and sexist remarks, including: "We should kill all the Muslims"; "All Gandhi-men are pedophiles"; "The only types of jobs that are appropriate for Blacks and Hispanics are unloading cargo off ships off the Jersey shore"; and "I'm going to fuck every woman walking around in the world."

28.     Chen did not report these remarks then because he was afraid of retaliation for complaining about a senior banker in the ConsumerGroup, a group that he had just joined.

29.     In late June 2003, Chen was asked to meet separately with Habert and with Lisa Fitzig, a senior Citigroup human resources or administrative employee. During a series of meetings with them, they made false, serious allegations against Chen, including that he refused to fly out to attend meetings in California for a deal on which he was staffed; that the client on that deal requested that Chen not attend future meetings; that Chen tried to "kill" the client on that deal; and that Chen turned down a quantitative modeling assignment offered by Habert. Habert admitted to Chen that he had not investigated the first three allegations to determine whether or not they were true.

30.     Not only were all these allegations false, but the first three had allegedly occurred one to two months earlier, and nothing had been said to Chen about such, if true, potentially serious conduct. Also, during the meetings with Fitzig, Chen repeatedly requested to be moved into another group in accordance with Balistreri's prior promise to him, but Fitzig refused.

31.     After these meetings and unjustified charges, Chen, in early July 2003, complained of discrimination internally to Cynthia Caruso, the Human Resources Generalist for the IBD. At the first of several meetings in early July, Chen told Caruso that senior bankers in the Consumer Group made derogatory comments about other cultures, which made him feel

uncomfortable as a minority; at the second meeting in early July, Chen told Caruso about the comments about "pussies" and the statement that "We should kill more of them [Arabs]." Chen did not name Habert because he was afraid of retaliation. In subsequent meetings in early July, Chen provided additional information sufficient in detail for Caruso to know that Habert was the person about whom Chen was complaining; and, on information and belief, Caruso did know that Habert was that person. Chen informed Caruso that the individual was a male senior banker, not a Managing Director (and therefore a Director), and someone with whom Analysts and Associates would have a lot of interaction. At that time, Habert was the only Director in and the Associate Staffer for the Consumer Group.

32. Caruso told Chen that she would begin an investigation and "get senior people involved." When Chen warned Caruso that the senior people might also be the ones who were part of the problem, she stated that she was "not going to start with someone like Marco Habert."

33. After Chen complained internally of discrimination, Citigroup retaliated against him, including failing to investigate promptly and adequately and to credit his complaint, refusing to transfer him from the Consumer Group, and ultimately discharging him as described below.

34. In early July 2003, Caruso agreed to help Chen find a new position within Citigroup, outside the Consumer Group and the IBD. Between July 2003 and October 2003, Chen applied for numerous Citigroup positions outside of the IBD, but he was never offered a new position.

35. In August 2003, Chen received a positive mid-year review regarding his performance within the Consumer Group. Shortly after this review, Caruso called to

228315 v1                                    8

congratulate Chen and asked him if he had changed his mind about wanting to find a new position outside of the Consumer Group. Chen understood that Caruso was also impliedly asking if Chen wanted to drop his complaint against Habert. Chen told Caruso that he wanted to continue looking for a new position. On information and belief, Caruso did not begin an investigation into Chen's complaint until September 2003.

36. In October 2003, Chen met with Caruso to discuss the status of the investigation and his disappointment at the lack of progress in his search for an appropriate position within Citigroup. Chen asked Caruso when he would be moved out of the Consumer Group and the IBD. Caruso told him that the Consumer Group did not think it had a bad relationship with Chen and that she could not guarantee Chen another position within Citigroup. Chen then asked Caruso if Citigroup would consider giving him a severance package to enable him to search for a position outside of Citigroup, to which Caruso responded that Chen was a valuable member of the Consumer Group and a valuable member of Citigroup, and questioned why Citigroup should pay severance to get rid of a valuable and productive employee. Caruso also stated that because Chen still had not given the name of the senior banker about whom he was complaining, Citigroup's liability was mitigated.

37. Chen met with Caruso at least three more times in October 2003. At the second meeting, Chen informed Caruso that if Citigroup rejected his severance request, he would have no choice but to pursue his complaint externally by filing a charge with the EEOC. At the third meeting, Caruso continued to state that Chen's not providing the name of the senior banker about whom he was complaining was the holdup and hampering Citigroup's ability to complete the investigation. At the fourth meeting, Caruso informed Chen that Citigroup had rejected his severance request.

228315 v1

9

38. After Chen told Citigroup that he would file a complaint with the EEOC, Citigroup took a series of retaliatory actions against him, including failing to credit his complaint of discrimination; putting him on a Performance Improvement Plan ("PIP") and failing to implement the PIP; ranking him at the bottom of and paying him the lowest bonus for his Associate class; and terminating his employment.

39. Approximately one week after Chen informed Citigroup that he would file a complaint with the EEOC, in mid-October 2003, Citigroup replaced Habert as Associate Staffer with Ian Sugarman.

40. Chen filed a charge of discrimination with the EEOC on or about November 6, 2003.

41. On December 11, 2003, at a meeting attended by Michael Eck (Managing Director in and Co-head of the Consumer Group), Caruso and Chen, Caruso informed Chen that Citigroup's investigation was complete; that it had not been able to establish any inappropriate behavior; and that Habert's comments against Arabs and Muslims described above were made in the context of "a political discussion."

42. Citigroup placed Chen on a PIP at the December 11 meeting allegedly because of concerns "about [Chen's] ability to successfully meet the demands of the role of Associate" and unsatisfactory performance. Placing Chen on the PIP substantially decreased his opportunity to receive a non-discriminatory bonus and to continue employment.

43. On information and belief, no other Associate in Chen's class was placed on a PIP in 2003. Prior to December 11, 2003, outside of the false allegations made by Habert and Fitzig in June 2003 described above, neither Eck nor anyone else in the Consumer Group

had stated concerns regarding Chen's ability to successfully meet the demands of an Associate position or that his performance was unsatisfactory.

44. On information and belief, Citigroup intended to discharge Chen no matter how he performed during the period of the PIP.

45. The terms of the PIP treated Chen differently from other Associates in the Consumer Group and demeaned, humiliated and embarrassed him. For example, it required Chen to be in the office by 9 a.m., although no other investment banker in the Consumer Group was required to be in the office then and most did not usually arrive in the office until approximately between 9:30 – 10:00 a.m. Chen was required to e-mail the new Associate Staffer Sugarman, and Chen's secretary, in the event that he was not in by 9 a.m., although no other investment banker in the Consumer Group was subject to such requirement. Further, Chen was urged to reconsider his vacation scheduled for January 2004 that Sugarman had previously approved the month before, although several investment bankers in the Consumer Group were scheduled for vacation of at least two weeks in December 2003 and no one else was urged to reconsider a vacation schedule. Chen did reduce his vacation time to two weeks. In addition, on information and belief, during the period of the PIP, Sugarman told an Analyst with whom Chen was assigned to work that the Analyst's involvement on the assigned matter would be cursory, and intentionally encouraged the Analyst to do minimal work in order to prevent Chen from performing successfully on the assignment. The foregoing retaliatory actions created a hostile work environment for Chen, interfered with his ability to perform his job and adversely affected the terms and conditions of his employment.

46. Citigroup failed to fulfill the terms of the PIP that it laid out for Chen in that Eck and Sugarman failed to meet with Chen on a biweekly basis to review progress and

discuss concerns. Instead, Eck met with him only once, on December 18, 2003, when both he and Sugarman told Chen that that Chen had shown "marked improvement" and gave feedback ranging from "okay" to "marked improvement" in the areas that the PIP stated Chen needed to improve. This was the only review anyone in the Consumer Group conducted with Chen during the period of the PIP, prior to his termination.

47. For ranking and 2003 bonuses, Associates in Chen's class were grouped into three tiers in descending order: a) "Top of the Class," with an average bonus of $100,000; "On Target," with an average bonus of $84,081; and "Bottom of the Class," with an average bonus of $41,250. Citigroup ranked Chen at the Bottom of the Class and paid him a bonus of $30,000 for 2003.

48. Citigroup disproportionately ranked Asian Associates, including Chen, in the lowest tier: 33 percent of the 12 Asians in Chen's class of 53 Associates, compared to only 8 percent of the 37 white Associates, were ranked in the Bottom of the Class.

49. Citigroup also paid Asian Associates disproportionately lower bonuses than whites: the average bonus in 2003 for Asians in Chen's class was $72,917, compared to the average bonus for white Associates of $84,562.

50. Chen received the lowest bonus in his Associate class for 2003, including the lowest bonus of those ranked at the Bottom of the Class.

51. Despite Chen's sole PIP review being positive overall, and no subsequent notification that his performance had deteriorated or was unsatisfactory, Chen's employment was terminated on February 6, 2004. He was the only Associate in his class who was permanently discharged; an African American Associate was also discharged but was subsequently rehired.

52. By the acts and practices above, Citigroup discriminated against Chen because of his race, ancestry and national origin, and retaliated against him for complaining of discrimination by subjecting him to a discriminatory and hostile work environment, reducing his compensation, restricting his opportunity for employment in a non-discriminatory environment, and terminating his employment.

53. As a result of Citigroup's discrimination and retaliation described above, Chen has suffered substantial loss of income and employment-related benefits, harm to his reputation in the financial community, adverse effects on his career, diminished earning capacity, and substantial emotional harm and distress.

### FIRST CLAIM FOR RELIEF
### RACE AND NATIONAL ORIGIN DISCRIMINATION

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-53 above as if set forth fully herein.

55. By the above conduct, defendant has discriminated against plaintiff in the terms and conditions of his employment on the basis of his race, ancestry and national origin, in violation of Title VII, Section 1981, the HRL and the City HRL.

56. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

57. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, and mental anguish and humiliation as a result of defendant's discriminatory practices until and unless this Court grants relief.

## SECOND CLAIM FOR RELIEF -- RETALIATION

58. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-57 above as if set forth fully herein.

59. By the above conduct, defendant has retaliated against plaintiff in the terms and conditions of his employment because of his opposition to unlawful discrimination, in violation of Title VII, Section 1981, the HRL and the City HRL.

60. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

61. Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury, monetary damages, and mental anguish and humiliation as a result of defendant's discriminatory practices until and unless this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a. declaring that the acts and practices complained of herein are in violation of Title VII, Section 1981, the HRL and the City HRL;

b. enjoining and permanently restraining these violations of Title VII, Section 1981, the HRL and the City HRL;

c. directing defendant to place plaintiff in the position he would have occupied but for defendant's discriminatory and retaliatory treatment of him, and make him whole for all earnings he would have received but for defendant's discrimination and retaliation, including but not limited to salary, bonuses, pension and other lost benefits;

      d.      directing defendant to pay plaintiff compensatory damages for the emotional distress defendant's unlawful conduct has caused plaintiff;

      e.      directing defendant to pay plaintiff punitive damages;

      f.      awarding plaintiff the costs of this action together with reasonable attorneys' fees, as provided by Title VII, 42 U.S.C. §1988(b), and the HRL, and interest;

      g.      awarding such and other further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       May 12, 2005

                    VLADECK, WALDMAN, ELIAS &
                    ENGELHARD, P.C.

By: *Julian R. Birnbaum*
     Julian R. Birnbaum (JB 6721)
     1501 Broadway, Suite 800
     New York, New York  10036
     (212) 403-7300
     Attorneys for Plaintiff